BATES COUNTY BANK, Appellant, v. GAILEY et al.; and BATES COUNTY BANK, Appellant, v. HENSLEY et al.

Division Two, July 3, 1903.

1. **Fraudulent Conveyance:** MORTGAGE IN EXCESS OF DEBT. A deed of trust given by an insolvent to secure a note for an amount in excess of the amount owing by him to the payee, who knows all about his financial condition, is to the extent of the excess fraudulent, and the entire deed of trust is thereby vitiated.

2. ————: ————: DUEBILL. The payee of the note, which was for $2,800, testified that the insolvent, whose financial condition and purpose he well knew, in fact owed him only $2,300, and that the

balance was made up by a duebill for $500, or a note payable on demand, which he was to pay by paying for purchases' of stock by the insolvent as fast as he bought them, and which in fact he did pay in thirty days in that way. *Held*, that this did not relieve the transaction of the fraudulent character with which it became inoculated at the time the deed of trust and note were made, but made the whole transaction fraudulent.

3. ———: ———: BONA FIDE DEBT: PREFERENCE: KNOWLEDGE AND PARTICIPATION. If any of the debt secured by the conveyance is not bona fide, or does not exist at the time the conveyance is made by the debtor for the purpose to hinder, delay and defraud his creditors in the enforcement of their claims, and the creditor thus preferred either knew of, or participated in, the purpose of the debtor when the transaction is consummated, the conveyance will be fraudulent as to other creditors.

Appeal from Bates Circuit Court.—*Hon. H. C. Timmonds,* Judge.

REVERSED AND REMANDED.

*Thomas J. Smith* for appellant.

(1)    Defendant Hensley having given, and defendant Gailey having taken, a deed of trust on Hensley's real estate for $2,800, when according to their own testimony Hensley was then indebted to him at most not exceeding $2,300, was a fraud upon the plaintiff and avoids the conveyance, even conceding that Hensley owed the $2,300.    State ex rel. v. Hope, 102 Mo. 429; Boland v. Ross, 120 Mo. 217; Barton v. Sitlington, 128 Mo. 174; Imhoff v. McArthur, 146 Mo. 378.    (2)    The fact that Hensley gave Gailey a deed of trust for $2,800, when according to their statements Hensley only owed $2,300 and took a duebill back from Gailey for $500, was making this conveyance to his own use to the extent of $500, and this rendered the whole conveyance fraudulent under the law.    Mfg. Co. v. Steele, 46 Mo. App. 496; State v. Benoist, 37 Mo. 500; Donovan v. Dunning, 69 Mo. 436; Pattison v. Litton, 56 Mo. App. 325; Roberts v. Barnes, 127 Mo. 405; Bank v. Powers, 134 Mo. 432; Dry Goods Co. v. Laughlin, 78 Mo. App. 578; Hardware

Co. v. Riddle, 84 Mo. App. 275; 14 Am. and Eng. Ency. Law (2 Ed.), pp. 246, 247 and 248. (3) The great weight of the evidence in the case, however, shows that the $1,000 or $1,010 secured by deed of trust on the Forsythe land, conveyed by Hensley to Downey subject thereto, never went into this $2,800 deed of trust, but was put into the deed of trust as padding. This, if true, also rendered this deed of trust void. (4) Fraud can not, as a general rule, be proven by direct and positive evidence, but must be shown by facts and circumstances. Massey v. Young, 73 Mo. 273. "Facts outweigh loudest protestations of innocence." Springer v. Kleinsorge, 83 Mo. 159. (5) The fact that defendant Gailey, charged with fraud in this matter, having testified in his deposition, "I generally keep an account of my dealings in a book," and further, that in these transactions he had without exception checked on the Farmers Bank at Butler, and then upon the trial, knowing, as he said, that he would be called upon to explain these matters, yet still failed to produce a book or document to corroborate his testimony upon the trial, raises a presumption against him. Bent v. Lewis, 88 Mo. 462. (6) These being suits in equity and the evidence consisting so largely of documents and depositions, this court will not be governed by the findings of the court below, but will weigh the evidence for itself. Allen v. Logan, 96 Mo. 591; Blount v. Spratt, 113 Mo. 48; Lins v. Lenhart, 127 Mo. 271. (7) The question of the intention of defendants in making this mortgage was immaterial, if the legal effect of it was to transfer from Hensley anything of value which plaintiff had a right to subject to the payment of its debt. Coleman v. Burr, 93 N. Y. 17; Mackason's Appeal, 42 Pa. St. 330; Ghormley v. Smith, 139 Pa. St. 584; Harting v. Jockers, 126 Ill. 627; Davidson v. Burke, 143 Ill. 139.

*Silvers & Silvers* for respondents.

(1)   It is contended by appellant, in his first point, that the deed of trust given by John T. Hensley to H. M. Gailey, for $2,800, was fraudulent, because it is said Hensley only owed Gailey $2,300 at the time the deed of trust was given. A careful reading of all the testimony on this subject shows that in addition to the $2,300, Gailey loaned Hensley $500 to be used in the purchase of stock. This makes up the entire consideration. (2)   It is contended that Hensley gave Gailey a deed of trust for $2,800 when he owed only $2,300, and taking from Gailey a due-bill for $500, Hensley was making a conveyance for his own use, to the extent of $500, and that this rendered the whole conveyance fraudulent under the law. This contention is untenable. The statute against making conveyance for one's own use is leveled against transactions entirely different from this. It is a well-settled rule in law that, if a conveyance be made in good faith and for an adequate consideration, it can not be evaded by creditors. If there had been some secret understanding between Gailey and Hensley that the deed of trust should be given for $2,800, when Hensley only owed Gailey $2,300, and that upon the sale of the property, this $500 should be returned to Hensley, or if the amount of $500 was to be covered up by the deed of trust, or if Hensley had received no benefit, or if plaintiff had been hindered, delayed or defrauded, then there might be some reason for the contention of appellant. But here the debtor, Hensley, was not injured, neither was any one of his creditors injured. Gailey gave him first the duebill, then paid him $500, and his personal assets were increased by this amount. He bought stock, as the evidence shows, with this $500. He was in as good condition to meet any obligation he might owe to any other creditor, after as before he gave the trust deed. If, at this time, plaintiff had undertaken to enforce its claim against Hensley, it would have found him as well off after the deed of trust was given as before; so that no one was defrauded, or could have

been defrauded, in the transaction. 14 Am. and Eng. Ency. Law (2 Ed.), 248. (3) Appellant contends that if the conveyance from Hensley was such as to transfer anything of value from Hensley, which plaintiff could have subjected to the payment of its debt, then such business was fraudulent, no matter what the intention of the defendants might have been, and such conveyance should be set aside. This is certainly not the law. Gates v. Lebeaume, 19 Mo. 17; State v. Estel, 6 Mo. App. 6; Gens v. Hargardine, 56 Mo. 245; 14 Am. and Eng. Ency. Law (2 Ed.), 285; Gro. Co. v. Lewis, 69 Mo. 463. (4) A conveyance can not be set aside as fraudulent unless the grantee participated in the fraud and in the fraudulent intent. 14 Am. and Eng. Ency. Law (2 Ed.), p. 270; Byrne v. Becker, 42 Mo. 264; Bank v. Worthington, 145 Mo. 91. (5) Plaintiff, in its testimony, labored to show that several years after the deed of trust was given by Hensley to Gailey, Hensley gave a chattel mortgage to witness Rush and a deed to his father-in-law, Orear, with a view to covering up his property. It makes no difference what Hensley's intention was in making these deeds; if the conveyance to Gailey was made in good faith at the time, it can not be affected by any after conduct of Hensley, because, a conveyance to be fraudulent, must be so in its inception. Gates v. Labeaume, 19 Mo. 17; Page v. Kendrick, 10 Mich. 300; Stokes v. Jones, 18 Ala. 734; Hempstead v. Johnston, 18 Ark. 123; Cornish v. Dews, 18 Ark. 172; Klemm v. Bishop, 56 Ill. App. 613; Ray v. Simmons, 76 Ind. 150. (6) The conveyance from Hensley to Gailey could not have been fraudulent as the claim of plaintiff because, after it was made, Hensley had ample means in his possession to settle the claim of plaintiff. After having waited four or five years for Hensley to become insolvent, plaintiff should not now complain. 14 Am. and Eng. Ency. Law, p. 329; Wallace v. Penfield, 106 U. S. 260; Adams v. Collier, 122 U. S. 390; Glacier v. Walker, 69 Mo. App. 288. (7) Fraud will

never be presumed. The burden of proving it is on the plaintiff, as to the purpose and execution of the trust deed; and where the circumstances are as consistent with honesty as with dishonesty, the transaction will be affirmed. 14 Am. and Eng. Ency. Law (2 Ed.), p. 486; Pettingill v. Jones, 30 Mo. App. 280; Deering v. Collins, 38 Mo. App. 73; Martin v. Fox, 40 Mo. App. 664; Shoe Co. v. Casebeer, 53 Mo. App. 640; Williams v. Casebeer, 53 Mo. App. 644; Halderman v. Stillington, 63 Mo. App. 212; Implement Co. v. Ritchie, 143 Mo. 587; Bank v. Worthington, 145 Mo. 91.

BURGESS, J.—These are suits in equity and were begun on the 29th day of April, 1889. The purpose of one of them, to-wit, that of the Bank v. Gailey and others, is to have a certain deed of trust executed by the defendant on the east half of the northeast quarter and the northwest quarter of the northeast quarter of section fourteen, township forty, range thirty-three, in Bates county, declared fraudulent and canceled on the ground that the defendant John T. Hensley did not owe to the defendant Gailey the amount recited in the deed of trust ($2,800) or any other amount. Another ground upon which the suit is predicated is that if in fact the defendant Hensley was owing the defendant Gailey any amount which was secured by said deed of trust, it was a sum much less than the amount for which said deed of trust was taken. The deed of trust bears date May 4, 1892, but it was not recorded until the third day of September, 1892.

The other suit is against John T. Hensley and his wife, M. B. Hensley, to have set aside and declared fraudulent a warranty deed made by said Hensley and his wife of date March 16, 1897, recorded April 26, 1897, by which the land in controversy above described was conveyed to W. D. Orear, who was the father-in-law of defendant John T. Hensley; and also to have set aside and decreed as fraudulent a deed from W. D. Orear

and wife to the defendant M. B. Hensley, who is the wife of the defendant John T. Hensley, which deed bears date May 26, 1897, but was not recorded until April 18, 1899.

The ground upon which the plaintiff predicated its rights of recovery in these two actions, in addition to the alleged fraudulent character of the conveyance made, was the fact that at the June term, 1897, of the circuit court of Bates county, Missouri, the plaintiff had recovered judgment against the defendant John T. Hensley for the sum of $1,154.25, with costs, amounting to $9.45, on which judgment an execution had been issued and delivered to the sheriff of Bates county, in October of 1897, and the real estate above described had been sold under levy made under said execution, and purchased by the plaintiff, as well as upon the fact that the plaintiff was still a judgment creditor under said judgment against the defendant John T. Hensley, there being as alleged in the petition more than eleven hundred dollars still due the plaintiff on said judgment, which was alleged to be a lien against this real estate.

Immediately upon the serving of the writ of summons on the defendants Hensley and Gailey, in the first-entitled suit, the real estate covered by said deed of trust was advertised for sale thereunder by the defendant Gailey in the name of W. C. Brown, the sale being set for the 12th day of June, 1899, and before the convening of the June term of the Bates County Circuit Court, to which the writs in this suit were returnable.

Thereupon on the 5th day of June, 1899, the plaintiff in this case filed a petition for a temporary restraining order in said court, and on that date sued out from the judge of said court at chambers, an order enjoining the sale of said real estate under said deed of trust until the final hearing of the case of the bank against Gailey.

The testimony of the defendant W. C. Brown as given in his deposition, showed that he knew personally

nothing at all about the existence of the alleged debt referred to in the deed of trust from the defendant Jno. T. Hensley to W. C. Brown, as trustee for defendant Gailey, in the sum of $2,800, until he was called upon by Gailey to take necessary steps to foreclose the deed of trust. This was after Gailey and Hensley had been served with the writ of summons in the suit against them to set aside this deed of trust for fraud.

Brown testifying, said: "Mr. Gailey told me he wanted me to push the claim. . . Mr. Gailey told me to have the sale as soon as we could get it, and my idea was to have it just as soon as it could legally be made." Brown also testified that he told Gailey to go ahead and have Mr. Silvers insert the necessary notice, which the evidence shows was done by having it published in the Butler Free Press, the first issue in which it appeared being May 12, 1899, while the record in the case shows that Gailey was served with process on the 8th day of May, 1899.

The defendant John T. Hensley in his deposition testified that he was not at home when the writ of summons was left there with his family, but "when I came back my wife gave it to me a day or so after it was left."

"Q. How long after that did you have any talk with Mr. Gailey? A. I can't say; it was several days after that. . . .

"Q. When did you learn that this land was advertised for sale under the deed of trust? A. About the first or second copy, but I don't take the paper it was in.

"Q. Did you have any talk with Mr. Gailey? A. No, sir.

"Q. Ever talk with him about it? A. Yes, sir; he talked to me about it before he advertised it.

"Q. How long? A. A short time.

"Q. What did he say? A. He wanted to wait if I could pay him so much money.

"Q. Where did you have this talk? A. I can't

say; I spoke to him several times about it.   I told him I couldn't raise it.''

Hensley further testified that he had been intimately acquainted with Gailey for thirty years and during all this time had been borrowing more or less money from him and that from the time the Kansas City, Pittsburg & Gulf railroad had been built through Bates county, in 1890, he had been with his brother, Cole Hensley, buying and shipping stock to market from Amoret, on this road, and always in the name of the defendant H. M. Gailey, Gailey furnishing the money to the persons from whom the stock was bought, taking his money out of the proceeds and turning over to the defendant John Hensley or his brother, Cole, whatever of profits were left to them.

With reference to the note secured by the deed of trust in question, Hensley testified as follows, on direct examination:

''Q.   What was the amount of the note to Mr. Gailey?   A.   $2,800 I think.

''Q.   What was the note given for?   A.   Borrowed money and notes; money that I got at different times; old notes that had been standing for a number of years, got at different times a long time ago.

''Q.   What notes did you owe him at the time of giving the deed?   A.   We owed him several.   I think I owed him one for $900 with interest on it that amounted to $1,000.

''Q.   Then at the time this note was given you owed him one thousand dollars?   A.   I think I owed him $2,300 when the mortgage was given.

''Q.   How was that, in coin and notes?   A.   It was part money and part notes.

''Q.   How much in notes did you owe him?   A.   I couldn't tell, it had been so long.   I know I owed him $900 that amounted to $1,000.''

He further testified that this $900 was borrowed to help his brother, Joe, and that he secured the $900 by

giving to the defendant H. M. Gailey a deed of trust on 120 acres of land in Bates county, known as the Forsythe place, being the north half of the northeast quarter and the southwest quarter of the northeast quarter of section twenty-six, township forty, of range thirty-two, which was afterwards sold on the 20th day of November, 1891, to Wm. A. Downey for $3,000, in which deed of conveyance is found the recital, "subject to a certain deed of trust for $1,500 which the grantee herein assumes and agrees to pay." He further testified that this land which he testified his brother, Joe, owned and which he used this $900 in paying incumbrances against, was real estate that he himself sold and got the proceeds therefor, selling one 80 acres to Thomas Wright, who was his son-in-law, and the other 80 acres was conveyed by his brother, Joe, as shown by the deeds introduced in evidence, to his nephew, Charles H. Hensley, by whom it was afterwards by title bond sold to David A. Bean, and conveyance made to the wife of David A. Bean by Charles H. Hensley, but which Mr. Hensley in his deposition admits that he sold and got the proceeds therefrom.

"Q. How about Tom Wright, how did he pay? A. Why, he shouldered the eastern loan, which amounted to $1,400, I think.

"Q. What was he to pay you in addition to the mortgage on it? A. Twenty-six dollars an acre, I think. There were 80 acres and he gave me a note for the difference. I sold the note to James Rush, who lives west of Amoret, in the State of Kansas. This note was for $720, I think, or something like that."

In regard to this same loan, he testified: "I was paying interest on the loan right along and am paying the eastern loan company now. Whenever interest comes due I pay it."

And further testifying with regard to the amount which he was owing defendant Gailey when this $2,800 note and deed of trust were given, he testified:

"Q. Going back to the original $900 note you owed Mr. Gailey, what else did you get from him? A. When we fixed up, we fixed up that $900 note and another old note that had been standing for years and had doubled itself. They all amounted to $2,300.

"Q. What was there to make $2,300? A. Other notes.

"Q. What were they given for? A. Different things, some of them were twenty-five years old. Whenever I wanted money, I went to Mr. Gailey. I can't remember the amount of any of them but the $900 note. They were small and were not secured by anything. I paid him once in a while. I have been doing business with him pretty much for thirty years, and I never asked him for a dollar that I didn't get it.

"Q. Did you get any money from him? A. He gave me his note for $500, and I was to buy stock with it just when I wanted to.

"Q. You didn't buy stock with the note, did you? A. I just gave tickets to the men on him and he paid them.

"Q. What did you do with the note? A. I gave it back to him when the stock was bought.

"Q. How long was that? A. A year or so; well whenever I wanted it, he gave it to me.

"Q. How did you happen to give him a mortgage for $2,800 when you only owed him $2,300? A. I wanted money to work on. The note was on demand and whenever I wanted it he would give the money to me. I have no idea how long I kept the note."

Cross-examination: "Q. Finally you owed him several small notes and one note for nine hundred dollars with interest on it, and all these notes together amounted to $2,300? A. Yes, sir; that's my recollection.

"Q. At the time you gave him this mortgage? A. Yes, sir.

"Q. This mortgage was to cover a nine-hundred-

dollar note with interest on it and several small notes and the interest on them that were unsecured and also to cover $500 that you wanted to use. That's your recollection? A. Yes, sir.

"Q. At that time he did not pay you five hundred dollars at all, but gave you this note? A. Yes, sir.

"Q. That made up the consideration for this mortgage? A. Yes, sir."

H. M. Gailey, in his deposition, testified with reference to his dealings with the Hensleys, that he had always checked on the Farmers Bank at Butler, Missouri, whenever he drew any checks at all, saying: "Yes, since I been interested in the Farmers Bank I believe I am safe in saying that I never got any stock, never checked any for the Hensleys in any other bank than the Farmers Bank."

With reference to the taking of the deed of trust in dispute he testified that he knew the same was subject to a prior deed of trust for five hundred dollars, and was taken on land that he knew the defendant Hensley and his wife lived upon for a great number of years, there being 120 acres of it, and that the land was then worth in his judgment $33 per acre, the wife of John T. Hensley not joining him in the trust deed.

"Q. You knew that during all these years Mr. Hensley was in strained circumstances? A. No, sir; I didn't, but then I knew that since he was tardy in paying me he must be using his money for something else or was hard up.

"Q. You knew that before you took this mortgage? A. No, sir; not serious circumstances.

"Q. Did you think he was prompt and straight at the time? A. I thought he was all right, yes, sir. I understood that he had several pieces of land and was getting rent from them.

"Q. What pieces of land did you understand him to own? A. The 120 acres that was called the Forsythe place, if I am not mistaken. I had nine hundred

or a thousand dollars against it. It was worth thirty dollars an acre. He also had some other land over there; that is, I understood that, but didn't look up the records to see. I always found Mr. Hensley straight with me, and I believed he owned what he said he did. I always found that, when I insisted on any money, I got it, he and Cole both.

"Q. What was the place over this way, the other place? A. Joe Hensley's place.

"Q. Did you know what he was going to do with the nine hundred dollars? A. Yes, he wanted to settle something or other, I think it was with regard to Joe's place. He wanted me to take a deed of trust on that land. I knew Joe's circumstances were not the best, and I didn't want to have anything to do with it.

"Q. What was the Forsythe place you spoke of, how much was there of it? A. 120 acres, I think.

"Q. You still have that mortgage? A. No, sir. . .

"Q. Was this a first mortgage? A. No, sir; a second mortgage.

"Q. What was there on it? A. Fifteen hundred dollars, is my recollection. There was 120 acres of that, that is my recollection; I am not positive. Mr. Downey knows, he bought it from Mr. Hensley.

"Q. Then you carried that along to what time, A. Why, it was two or three—it was put on that land in 1889, sometime, and taken off—I received the money sometime just shortly, previous to, or about, the time I took this mortgage on Mr. Hensley's home place. I think it was the self-same money that I got off Mr. Downey's place that went back on Mr. Hensley's place. I had a number of notes against Mr. Hensley previous to that time.

"Q. Old notes? A. Yes, sir; some had run until the interest had doubled the amount of the note. One was running thirteen years with not a credit on it.

Vol 177 mo—13

"Q. Notwithstanding, you regarded him in good circumstances? A. I thought he was perfectly safe until I wanted myself secured.

"Q. How many of these notes did you have? A. May be half a dozen.

"Q. What did the thirteen-year note amount to? A. It started at one hundred dollars.

"Q. Not a credit on it? A. No, sir; not at all. Some had credits on them, but I do not remember the amounts. This $900 note had $110 interest on it due at the time I took the mortgage on Mr. Hensley's place. I gave him these notes at different times and some money, not much at a time, and altogether it amounted to $2,300, and I gave him a note payable on demand; that I took up about a month or six weeks after it was given.

"Q. To whom did Mr. Hensley sell his Forsythe place? A. To Mr. W. A. Downey.

"Q. What did he sell it for? A. It seems to me it was thirty dollars, but I won't be sure.

"Q. Did he sell it before or after he gave this deed of trust in dispute? A. Before.

"Q. How long? A. I can't say. I think the two transactions were close together; at least my money came close there—I can't say. I never charge my memory with anything. I generally keep an account of my dealings in a book. I have a very poor memory and have had for several years."

Gailey further testified that he had lived within three miles of Hensley all this time, and saw him on an average of two or three times a week, and had sustained very intimate business relations with him all this while.

With regard to the payments made on the $2,800 note he testified that the payment was in "cash, the proceeds of the sale of some stock."

The plaintiff introduced in evidence certain deeds of conveyance by which it was shown that the 160 acres of land which the defendant H. M. Gailey referred to in

his deposition as being land which the defendant John T. Hensley had purchased from his brother, Joe, eighty acres only was conveyed to defendant John Hensley by Joe Hensley, which was thereupon by defendant Hensley conveyed to his son-in-law, Thomas A. Wright, the consideration for which, as testified by defendant Hensley in his deposition, was a note for $720 given by Wright to him, and which he afterwards sold to Rush, and the fact that Wright "shouldered the eastern loan" on this land. In this same deposition Hensley testified that, as stated, he himself had been paying and was then still paying the interest on this loan. The other eighty acres of this 160 acres of land was conveyed by Joe Hensley to Charles H. Hensley, a nephew of defendant John Hensley, for an expressed consideration of $1,200, said Hensley assuming the mortgage debts against said real estate. The defendant John Hensley, when his deposition was taken, testified that he himself sold this land to Dave Bean and received the purchase price therefor, while the records introduced in evidence show that this nephew of defendant Hensley made to Dave Bean his bond for title to this land, and afterwards conveyed it to the wife of David Bean for the expressed consideration of $2,240, subject to the deed of trust for $1,200. These several conveyances were made along from 1890 to 1895.

In 1897, the defendant John Hensley and his wife conveyed their home place of 120 acres to W. D. Orear for the alleged consideration of $3,600, a portion of which consisted in the assumption of incumbrances stated to be $3,300, by the grantee, who thereupon in turn conveyed this land back to the wife of defendant Hensley, but which deed was not recorded until after the death of W. D. Orear. The evidence showed that Mr. Orear was an old man without occupation, possessing a little home in the village of Virginia, worth not exceeding $400 or $500, the whole of his remaining estate not being worth exceeding $700; that he con-

tinued to live on his village place, and in fact did not pay for the equity which was conveyed to him by his son-in-law—never took possession of the land, and never received any rent therefor, and never had any agreement as to the receipt of the rent. The other evidence in the case showed that John Hensley was at the time of these conveyances and long prior thereto insolvent, doing business, as stated, in the name of H. M. Gailey the defendant.

It was shown by the deed of conveyance made to W. A. Downey by the defendant Hensley in October, 1891, of the Forsythe land, on which this $900 mortgage from Hensleys to Gailey was made, that it was conveyed to Downey subject to incumbrance, and that instead of Hensley owing Gailey this $900 on the 4th day of May, 1892, the date when the deed of trust for $2,800 from Hensley to Gailey is alleged to have been made, although it was not recorded until September 3d thereafter, this $900 with interest was paid off by a draft given by W. A. Downey to defendant, H. M. Gailey, and the note assigned by Gailey to Downey and by Downey as assignee released on the margin of the record of the deed of trust, on the 9th day of March, 1892. With respect to this $900, Gailey testified: "In the spring of 1892, Mr. Hensley wanted to know if I had in the meantime let Mr. Hensley have $900 that I took a deed of trust on what we called the Forsythe place, the place Mr. Downey afterwards bought. That was in 1888 or 1889, I am not sure now which, but the records will show. And Mr. Downey bought that and he assumed it in the payment of the land."

Plaintiff also offered in evidence tax list made out by H. M. Gailey and sworn to by him for the years 1894, '95, '96, '97, '98, and '99. From these it appears that on the first day of June, 1894, Gailey on his oath returned for taxation under the head of "solvent notes secured by mortgage or deed of trust," nothing; for the year 1895, nothing; for the year 1896, $600; for the year

1897, nothing; for the year 1898, $690; and for the year 1899, after this suit had been brought against him, $2,700.

The evidence showed that the debt due the Bates County Bank, under which the real estate in question was sold, was contracted by defendant Hensley in January, 1886, and that title to 80 acres of the real estate in question had been acquired by him prior to that time and occupied by him as a homestead, and that title to the remaining 40 acres was acquired by him in 1888, about two and one-half years after the debt was contracted.

Upon the part of the defendant the evidence showed that H. M. Gailey was a man of considerable property, living in the western portion of Bates county, Missouri. That he had formerly been a farmer. That when the little town of Amoret was laid out, he moved to Amoret. That in addition to his farming, he loaned considerable money of his own. That he had loaned money to defendant Hensley for a number of years prior to the giving of this deed of trust. The defendant Hensley was a farmer living in the western portion of Bates county. That he and his brother, Cole Hensley, were engaged in the purchase and shipment of stock from Bates county to Kansas City. That John T. Hensley borrowed money from H. M. Gailey and that Cole Hensley borrowed from the Bates County Bank. It tended to show that John T. Hensley had been in fair circumstances, financially, up to 1896 or 1897. That on March 9, 1892, he took from W. A. Downey, a trust deed on land he had sold to him for $494.15. That this left him 80 acres, which he sold to T. A. Wright, in 1895, out of which he realized $720. That he handled Joe Hensley's land, which he sold for $2,240, the equity being $1,040. This was in March, 1896. That in 1886 or 1887, he signed a note with one Short, payable to the Bates County Bank. That this note was carried along by Short until Short's death. That after Short's death, Hensley paid the in-

terest on the note for nearly eleven years and until 1897. That in 1897 the bank brought suit on the note and recovered judgment against Hensley. Hensley made several payments on the $2,800 note, but did not keep it reduced to the original amount. That when pressed by Mr. Gailey for a payment sufficient to reduce it to its original amount, he informed Gailey that he could not make such payment. That thereupon Gailey instituted foreclosure proceedings. That about the same time the Bates County Bank commenced this action to set aside the deed of trust, claiming that it was fraudulent.

That the consideration for the $2,800 note consisted of several old notes, which Hensley had given to Gailey at different times previous to the execution of the deed of trust and which at that time amounted to thirteen hundred dollars; also about one thousand dollars in money, and a duebill for five hundred dollars, which Gailey gave to Hensley, and which he paid off in about thirty days after the giving of the deed of trust. The evidence further tended to show that prior to the time when this deed of trust was given, Gailey had loaned Hensley nine hundred dollars. At that time Gailey took, as security, a deed of trust on some land which was afterwards sold to witness Downey. That when Downey bought this land, he assumed the payment of the $900. That in March, before this $2,800 loan was made, Downey paid off the $900, which with interest amounted to one thousand dollars. That Hensley applied to Gailey for this money, and that it was re-loaned to Hensley, and became a part of the $2,800 consideration for the deed of trust in question. That the consideration, therefore, consisted of $1,300 old notes, $1,000 paid by Downey and re-loaned to Hensley, and the $500 duebill given by Gailey to Hensley and taken up thirty days later. In this case the court found for defendants.

Under the evidence, the court found in the case of the Bank against Hensley and wife that the conveyance from Hensley and wife to Orear and from Orear and

wife to Mrs. Hensley were fraudulent and set the same aside as to the 40 acres of the real estate which was conveyed to Hensley after the debt in question had been contracted, but as to the other 80 acres, which the court found to be of the value of $2,400, the court refused to set the same aside.

In the case of the Bank against Gailey et al., the finding of the court was for the defendants. The plaintiff in each of the cases filed its motion for a new trial. These motions were overruled and an appeal regularly taken to this court.

It is claimed by plaintiff that the fraudulent intent of the defendant Hensley to dispose of his property in such a way as to place it beyond the reach of his creditors, especially the plaintiff, is established beyond any question by the evidence in this case. And it is argued that this contention finds support in the fact that the finding and judgment of the court in the case of the Bank against Hensley and wife, which has not been appealed from by defendants, are based upon the fact of a fraudulent conveyance of the land in controversy by defendant to W. D. Orear and by him back to the defendant, M. B. Hensley, the wife of John T. Hensley, who was the owner of the real estate in question.

But it is conceded by plaintiff that this conveyance was declared by the court to be fraudulent, and set aside for that reason only, as to a portion of the real estate in controversy, the court concluding that as to the eighty acres of land the defendant had a homestead right, which with the incumbrances found by the court to be valid, did not exceed the value of the eighty acres, as to which the finding of the court was against the plaintiff in the suit of the Bank v. Hensley.

The record discloses that the debt of the plaintiff, which is the basis of these suits, was contracted January 26, 1886, and that from that time Hensley was owing to the defendant Gailey debts that were unsecured, which amounted in May, 1892, to about $1,300,

some of which were twenty-five years old, and, among others, one note which was at that time thirteen years old, upon which there had never been made a payment.

The evidence shows that there were incumbrances amounting to $1,400 against the Forsythe place, containing one hundred and twenty acres, which Hensley owed, and the one hundred and sixty acres known as the Joe Hensley place was incumbered for about $2,500. One-half of this place was conveyed to the defendant John Hensley, who thereafter conveyed the same to his son-in-law, Thomas Wright, and the other half was conveyed to Charles H. Hensley, a nephew, which was sold by defendant Hensley for $700 for his own benefit, subject to a mortgage for $1,200, and the conveyance made by his nephew, Charles H. Hensley, to Mrs. Lida W. Bean, therefor. The conveyance by defendant Hensley to his son-in-law, Thomas Wright, was upon the consideration that Wright was to assume the payment of the incumbrance against it, and to execute to defendant Hensley his note for $720, which he did. Notwithstanding that by the terms of this transaction Wright assumed the payment of the incumbrances on this land, Hensley continued to pay the interest on the incumbrance as it became due.

This fact seems to us to be inconsistent with fair dealing upon the part of defendant Hensley, and clearly indicated a purpose upon his part to cover up and place beyond the reach of his creditors, and especially the plaintiff, his property.

But this is not all. At once upon the institution of the suit for the purpose of having declared fraudulent and void as against creditors, and especially this plaintiff, the deed of trust by Hensley and wife of date May 4, 1892, to Brown, trustee for the use and benefit of de-defendant Gailey, they at once proceeded to sell the land therein described at public sale, but at the instance of plaintiff were enjoined from proceeding therewith. Brown, the trustee, was requested by Gailey to push

the matter as fast as he could and have the sale at the earliest day possible.

It seems that the depositions of Hensley and Gailey were taken before the trial of this case. Hensley then testified that at the time the note and deed of trust were executed he was owing the defendant Gailey old notes, one of which was at least twenty-five years old, which were unsecured and which amounted to $1,300; and in addition to that he was owing him $900, with interest which amounted to $110, that was secured by a deed of trust on 120 acres of land known as the Forsythe place, which was afterwards sold by him to W. A. Downey, and that these debts, which he then owed the defendant Gailey, amounted to $2,300, together with $500 for which Mr. Gailey gave him his duebill, made the $2,800, the amount of the note secured by this deed of trust which he gave to Gailey.

That he got no money at the time the deed of trust was given, but that Gailey gave him a duebill for $500, the understanding being that he should buy some young stock and give orders therefor upon Gailey, who would pay the parties, and the amounts were credited upon the duebill until the same, as testified by Hensley, were taken up a year or two after it had been given.

Gailey testified that at or about the time the deed of trust was given, he may have paid Mr. Hensley some small sum of money; that Mr. Hensley wanted $500 with which to buy some young stock and as he could not spare the money at the time he gave Mr. Hensley his duebill for $500, which, together with the unsecured notes which he held at the time, and the $1,000 due on the note secured on the Forsythe place, then amounted to $2,800; that he took Hensley's note for $2,800 payable five years thereafter, giving, as stated, his duebill for $500 to Hensley, on which he paid Hensley some money and paid orders that Hensley gave upon him for the balance.

At the trial the plaintiff introduced in evidence the deed from Hensley to Downey to the real estate covered by the $900 mortgage to Gailey, which showed that in October, 1891, more than six months before the date of the deed of trust in question, Downey purchased this real estate and assumed the payment of the note to Gailey. The deed of trust securing this $900, made in 1899, with the marginal indorsements thereon, were also introduced in evidence by plaintiff and showed that on the 9th of March, 1892, about two months before the date of this last deed of trust, this $900 deed of trust was released of record by W. A. Downey, assignee.

The plaintiff read in evidence the assessment lists that were made and sworn to by the defendant Gailey from the year 1894 up to and including 1899, those prior to 1894 having, under the law, been destroyed. In these lists, with the exception of the years of '96, '98 and '99, he returned, under oath, that he had no solvent notes secured by mortgage or deed of trust, and for the year 1896 he returned $600 under that head, and for 1898 $960, but in the year 1899, after this suit was brought, he returned of such notes the sum of $2,700.

The evidence shows that for the years prior to the time this deed of trust was taken up to the time of the trial, the defendant Gailey, who testified that for thirty years he had been on very intimate relations with defendant John Hensley and had seen him generally on an average of two or three times a week, had been shipping stock bought by the Hensleys, but paid for by himself, in his own name, the method of doing business being that the Hensleys would go around and make contracts for the purchase of stock which would be brought into Amoret, where they were loaded on the train, paid for by the defendant Gailey, and shipped as his stock, the remittances being made to him by the Bank of Commerce at Kansas City through his bank, the Farmers Bank of Butler, Missouri.

The facts thus disclosed conclusively show (indeed, Gailey and Hensley so testified) that Hensley was not indebted to Gailey at the time of the execution of the deed of trust in question exceeding the sum of $2,300 at most, while it purports to be executed to secure the payment of a note for $2,800, being $500 in excess of the amount of indebtedness of Hensley to Gailey at the time, and was to that extent fraudulent as to the creditors, and under repeated rulings of this court vitiates the entire mortgage. [State ex rel. v. Hope, 102 Mo. 410; Boland v. Ross, 120 Mo. 208; Barton v. Sitlington, 128 Mo. 164; Imhoff v. McArthur, 146 Mo. 371.]     It is true that Gailey undertakes to explain this discrepancy by testifying that he gave to Hensley his duebill for $500 at the time which was taken up in thirty days. But this did not relieve the transaction of its fraudulent feature with which it became inoculated at the time.

It is well settled that in case of the conveyance of land with a fraudulent design on the part of the debtor, a creditor receiving the same in security for a bona fide indebtedness will not be affected, although he is aware that the transaction itself hinders or delays other creditors in the collection of their demands against the fraudulent grantor and that such was the purpose of the debtor, provided the creditor does not further participate in such purpose than by taking security for his debt. But upon the other hand, if any part of the debt secured by the conveyance is not bona fide, or does not exist at the time of this conveyance, or the conveyance is made by the debtor for the purpose to hinder, delay and defraud his creditors in the enforcement of their claims and the creditor thus preferred either knew of, or participated in, the purpose of the debtor when the transaction was consummated, it will be held to be fraudulent as to other creditors.

Now, it is perfectly clear from the evidence that Hensley conveyed the land in question to Brown, trustee for Gailey, for the purpose of defrauding his creditors,

and especially the plaintiff, and it is equally clear that Gailey knew of his fraudulent purpose, and participated in it. This is evidenced not only by his taking a deed of trust for at least $500 more than Hensley owed him, but his knowledge of Hensley's insolvency and his anxiety to have the land sold by the trustee in the deed of trust as soon as it could possibly be done, after plaintiff had sued Hensley on the note which it held against them. It is inconceivable that Gailey did not know of Hensley's insolvency and his straitened circumstances at the time of and for many years before the execution of the deed of trust, for he was in the habit of loaning him sums of money, some of which ran for thirteen to twenty-five years without the interest being paid upon them. Would not such circumstances of themselves satisfy any money-lender that his customer was insolvent or at least not prompt in meeting his obligations? It is idle to say that Gailey did not know of Hensley's insolvency at the time of the execution of the deed of trust in question, of his intent to defraud, hinder and delay his creditors in so doing, and that Gailey was not a party to and did not participate in his fraudulent purposes.

From these considerations it must logically follow that, in the case of Bates County Bank against J. F. Hensley and M. B. Hensley, the deed from Hensley and wife to Orear and from Orear back to Mrs. Hensley, are fraudulent and void as to the plaintiff as to that part of said eighty-acre tract in section 14, described in the petition in that case, which may be found to be in excess of the homestead exemption right. We therefore reverse both judgments and remand the causes that they may be proceeded with in accordance with the views herein expressed. All concur.